Good morning, everyone. Before we begin arguments, Judge Fischer and I would like to acknowledge Judge Fogel, who's here with us, assisting us, visiting. He's actually from the Northern District of California originally, but he's serving in D.C. right now as director of the Federal Judicial Center. So with that, we'll begin argument. He still has a full vote, so be nice to him. Let's see. Appellants. By the way, the clock is set at 20 minutes. It's counting down. If you want to reserve time for rebuttal, that's just fine. But it's going down. Sorry. Good morning, Your Honors. I'm Ralph Henry, counsel for Plaintiff Appellants. With me today is Kristen Munsell, co-counsel in this case. I would like to reserve about five minutes for rebuttal. We're here on appeal of District of Oregon's summary judgment ruling in a case concerning a rarely invoked exception to the Marine Mammal Protection Act and its prohibition on killing marine mammals. I think it's important to note that this is not a run-of-the-mill wildlife management case where the government, within its scientific expertise and discretion, gets to decide how to treat a particular species of wildlife to address a particular wildlife conflict situation. Instead, the Marine Mammal Protection Act prohibits the take not just of numbers of animals that would result in population-level harms, but prohibits the take of any individual wild marine mammal, any individual California sea lion in this case, unless certain statutory restrictions are met, excuse me, statutory exceptions are met. And unlike the last authorization, the first authorization under Section 120 of the MMPA, which this Court struck down in 2010, and where sea lions were taking up to 4.2 percent of salmon runs, and the program was set to terminate when that predation rate dropped to 1.0 percent, the government has now made it so that any impact from predation, any impact at all, will allow the killing of sea lions that are otherwise protected under the MMPA. But the statutory standard is not any impact. It's a significant negative impact on the decline or recovery of salmon. You lost me a bit there. You're saying that they did overtly eliminate the 1 percent threshold, and they explained why. And you obviously disagree with whether they did an adequate explanation, but they didn't say any. They did say it has to be a significant impact. You're quarreling with, as I understand it, the absence of a quantitative measure and with quality. But they aren't just saying any impact, are they, literally? I think that's not true. You'll note that I didn't necessarily mention numbers there. We are quarreling with the fact that there is no standard at all, quantitative or qualitative. Under this authorization, it is an absolute fact that if predation continues to decrease, and it has decreased every year since the States first requested authorization to kill sea lions in 2007, and if predation decreases below 1 percent, below half a percent, indeed, even if predation ceases entirely, the States can continue to kill otherwise protected sea lions. Do they have to have quantifiable data that's solid? I think they need to. I'm not sure I understand the question. Do they need to have a quantifiable standard or do they need to have quantifiable? Both. Okay. So we think that they need to have an objective and measurable standard that, you know, that permits reviewability, that allows for it to be clear when it is the point that predation would not be significant. It needs to be objective data. Whether that's numbers is not for the plaintiffs to say, but plaintiffs aren't saying we've advocated in the administrative process for a quantitative standard, to be sure. But the Marine Mammal Commission, for instance, in the administrative process, suggested a number of different options for actually reviewing significance. They don't seem quite – when you read this report, it seems like they acknowledge that it's pretty difficult to set a quantifiable standard with respect to the sea lions. Well, it may be difficult to set a quantifiable standard. But what's interesting is they've invoked this narrow exception to kill sea lions based on predation rates. Based on predation rates. And so – and based on the situation at the dam. And if you look at their sort of guidepost factors, those situations are all about numbers. Well, they do have some pretty good observable data. That's right. And so what we're asking for is – the question is when does it end? When does the killing stop? Well, they talk about a five-year look back. Well, so I think that that's the most egregious problem here in this case. So how would – what would you ask for then? You're saying what they haven't done. Let's assume that there is validity in the notion that there's not enough data to justify the 1 percent. So just accept that. What would you want them to articulate? Well, instead of predation rates, they could use some other measure. So, again, the Marine Management Commission said that they constantly – for these species, these listed ESUs of salmon, they constantly have to make decisions under the Endangered Species Act to manage them related to jeopardy and related to recovery. And so the Marine Mammal Commission said – and they have to do that. They're already doing that, the government is. So the Marine Mammal Commission, the expert body who's supposed to advise the agency as to how to implement the Marine Mammal Protection Act, said in administrative comments, you should use any one of a number of standards, including a delay of recovery time. And the Marine Mammal Commission actually pointed to past circumstances where delays in recovery time of, say, 10 percent – that was their recommendation here – could be used, where the agency is already measuring and has to on a regular basis how salmon are recovering. And so the Marine Mammal Commission said you could look to the delay in recovery time. You could look to the jeopardy standard as well for when this should not be significant. And interestingly enough, the jeopardy standard under the ESA is very close to the language in Section 120 of the MMPA. So the Marine Mammal Commission made recommendations. But I think it's not surprising that the agency eliminated the one percent termination point and put in its place nothing. Let's be clear. The idea that the time limit, the 5-year time limit, was to replace the one percent termination standpoint is a post hoc argument. It is not in the decision documents. They do mention the 5-year time limit in terms of terminating the one percent standard, but they do not use it for the purpose of replacing, which is actually what the district court said in the heading to its section on this issue, that the government replaced the one percent limit with this time limit. And I think there's a number of problems with considering the 5-year time limit as an adequate standard for reviewing whether the statutory standard is met and sea lions, which are not supposed to be killed unless that statutory standard is met, can no longer be killed. Can you explain just in practical terms how, let's take the recovery rate, how would that work on a year-to-year basis? I mean, you've got the, there's a seasonal period, as I understand it, when these sea lions come up and it coincides with the seasonal migrations of the salmonoids. So how would that affect, let's assume that there is a predation problem. So how would that play out year-to-year under your proposal? Right. Well, I think there's predation. I don't know that there's a problem, but I don't think we need to assume that. Let's not quarrel. I want to get to the substance of your answer. So I think that the agency already does this with respect to recovery. So it's not with respect to recovery. How does it work, year-to-year? That's my question. I don't know all the technical details, but I'll try to say what I understand in generalities, and that is that each year, the agency looks at the number of salmon that return to spawn and how many salmon are observed with the particular ESUs. And the ESUs run at different times, so they can separate out. And they use observation data and various models to assess how many salmon. So they use numbers with respect to salmon. And then they assess, based on that return, how well salmon are doing on a year-to-year basis. They use those analyses, which are more complicated than I'm making them out to be, but to determine how to set quotas and determine how much fishing is impacting salmon to determine dams. And they can look specifically at the sort of situs of where problems are happening. And they can, for instance, change spillage over dams or reduce quotas if they think that fishing is having a problem. They also do sort of temporal review. So not just physical situs, but temporal review. And in this case, with respect to predation, they have the ability to do that as well because they get reports from the hospital. At the end of each seasonal time, they do an analysis of the impacts, and then that would set the quota for the following year. Yes, it's based. They do base quotas in part on a number of different things and in part on whether or not it's influencing recovery negatively. So if the recovery of the species is not going well, takes a term for the worse, they will adjust, the government will adjust how it addresses sources of mortality. And it's a year later, right? Well, that's for recovery. But again, and this is one problem, I think, with the 5-year time limit, is I think it's absurd for the agency to say as a practical consideration to the court below, and I think this was Judge Simon below's real concern, was that the plaintiffs were saying, well, the statutory standard says don't kill unless you can trigger the standard. And are we really just asking for some kind of immediate stop and a minute-by-minute observation of this? And my response was, and still is, no. But 5 years. But the problem, as I read the totality of this, the problem is that each season is different. There's a lot of different moving parts that each particular season, the size of the run and the number of sea lions and a lot of other stuff. And so what the agency is saying is they need the flexibility to react pretty nimbly to those changes in conditions. And if you look at it a year later, you don't have that. I mean, that's what I understand to be their concern. I think there's two responses to that. I think that argument makes common sense, but it's not borne out by the facts of the situation where they make mid-season adjustments to fisheries harvests. That's one of their arguments. Well, it's one of their arguments that makes it controllable. Right. But they absolutely can and do put in traps. The sea lions, the way that they kill them, they don't sort of chase them through a forest or anything. They put in traps and the sea lions haul out and they euthanize them. They're currently doing it at Astoria. The sea lions haul out. People can see them. People go there and watch them. The sea lions aren't doing anything different than they normally do. They haul out on a trap. Someone goes into the trap and euthanizes them. Or they can shoot them, which they haven't done, and I don't think, to be fair, it's authorized, but I don't think to be fair that they have the intention of doing that. So on the one hand, I think the argument that they need greater flexibility than a more frequent assessment is not consistent with the way that they assess others and respond to other sources of mortality. I think the second problem with it is that it gets us into judging whether or not the MMPA standard has been correctly applied here based on practicable considerations, which the MMPA doesn't provide for. Again, this is not a situation where we're talking about just under the APA whether a federal agency responded correctly to an increase in deer population or some other general wildlife management circumstance where the agency has a lot of leniency, both in terms of what it does, but also, you know, how much it does and when it does it. Here, the statute's clear. These animals are not supposed to be killed unless they're having a significant negative impact. And under the current decision, it's not clear when significant kicks in. The Ninth Circuit, this panel, when it ruled in 2010, said that it agreed with the Marine Mammal Commission, and this is on page 1052, sorry, that's a reporter site, 626 Federal 3rd at 1052 specifically, that because the MMPA says you can't kill sea lions unless they are having a significant negative impact, and this is a quote, the taking authority should lapse once the predation is reduced to a level where it is no longer having a significant impact, end quote, and then, in addition, the agency needs to, quote, at which predation on salmonids by pinnipeds no longer would be considered significant. That was one of two issues that this Court remanded to the agency on, and it is not answered in this decision. Again, if sea lions start to take salmon somewhere else on the river and aren't eating these listed salmonids, I know that's not likely because the dam provides sort of a country kitchen buffet of sorts for salmon, but what if another source of mortality comes in and basically pushes the sea lions out? The government notes that stellar sea lions and other predators are actually moving into the area. If that's the case, and predation by California sea lions ceases at the dam entirely, the over 100 animals that are already branded and marked on the kill list can continue to be killed for years under this authorization, even if there's no predation at the Bonneville Dam. That's one thing I don't quite understand. My understanding of the process is they got authorization for, I think, around 92 annually, but that just means that they have to identify the actual animal that's doing the kill. Isn't that correct? Yes. There's a couple of different pieces to that. All right. But in any event, so if one of those active predators is a stellar sea lion, then they're protected, are they not? Yes, they won't kill stellars. So let's suppose that of the, let's suppose they find 50 of these critters who are the active ones in taking the salmonids, and 80 percent of those turn out to be stellar sea lions. Would that mean then they get a pass, and so only the California component would be subject to being euthanized? That's right. Only the California component would be subject to being euthanized. But I think my point is once you get on the list as a California sea lion, once you're seen eating salmon at the dam for a certain number of days. There's a way of identifying these individuals. Then you're either identified by physical characteristics or more often a brand. Okay. Then you go on your way, and you go 100 miles downriver to Astoria. You never come back to the dam. And even if your buddies never go up and eat any more salmon there, the state can and will, we know, because they have in recent history been killing sea lions down at Astoria nowhere near the dam, and sea lions who have been on the list for more than just this year or last year. So if predation drops to minuscule levels or even none at all, States can continue to kill sea lions as though prospectively there could be a problem in the future, even though the statutory standards are having a significant impact. Your time is running out. But what is it that you want us to do? I want you to – I think vacature is the appropriate remedy here. We want you to remand to the agency with instructions that they need to make clear exactly what they think significant is. Again, I think our briefing goes into why we think that they just defined significant to mean meaningful, to mean not ineffectual, which just means an effect. And I think with respect to significant, they also need to identify, as this circuit said before, what would be insignificant? Because, again, you can't kill sea lions if they're not having a significant negative impact. And so I think that what we need to know with clarity is what the agency really thinks significant is. What the agency thinks is a barrier to recovery and what is not, which I think is confused and still not well explained as between its past decisions on fisheries and dams in this one. And very specifically, how low does significant go? How low does significant go? Because it can't just be any time. And the time limit is a time limit that is based on a separate statutory language under the MMPA. And, again, I think this is the most egregious problem, so I want to emphasize it. The time limitation is required by separate statutory language, 16 U.S.C. 1389C5. It's separate than the trigger for actually killing the sea lions. The time limitation was included, different time limitations, in the prior 2008 and 2011 authorizations. It is here, but those 2008 and 2011 authorizations had termination clauses, and this one doesn't. It goes to zero. You can kill at any time. And most importantly, in the hearing at summary judgment, the transcript at page 62, it's excerpts of record at 62. The court asked counsel whether or not how it is that the time limit could be the justification for applying the significant negative impact and when the program starts and stops. And counsel responded that there was no analysis behind that and that the five-year time frame was adopted simply because that's what the States requested in their application. So the government, this idea that it's the qualitative standard for ending the program is totally post hoc. Okay. You got two minutes for rebuttal. Good morning, Your Honors. May it please the Court. I'm Vivian Wong for the National Marine Fishery Service. With me at counsel table is Ms. Renish Smith from Oregon and Mr. Young of Washington. Your Honors, I'd like to begin by addressing plaintiffs' repeated assertion that there's this hypothetical moment in which predation could somehow entirely cease to exist or that, you know, predation levels would drop to zero. They do not present any piece of evidence that suggests that the pinniped predation problem, which is measurable and has been growing since 2002, would be likely to just stop of its own accord. And indeed the case, maybe you're going to answer it, but the thrust of his argument, I understand, is, yes, predation exists, but at what point does it become significant or not significant? And how does one, what's the measure? In other words, let's suppose we're back here in two years of experience and they come in and say, look, we told you so. They're killing these sea lions and the data show that there's, you know, normal impact, nothing serious going on. And you all say, well, we still think it's appropriate to go ahead and shoot or euthanize. What would be the standard embedded in what these approvals have been authorized under? What's the standard we would apply, just factually, to determine whether the application has been reasonable or not? In the Federal Register notice where NIMS sets out its interpretation of the meaning of the phrase significant negative impact in the context of section 120, it's a straightforward inquiry, Your Honor. The agency looks at whether these pinnipeds are having a significant problem. They define that in terms of something that's meaningful informed by seven factors. So among the factual circumstances that the agency is evaluating is whether the nature of the interaction is creating a measurable effect on the productivity and the viability of the fish. And so Your Honor suggested perhaps a two-year time frame. The agency has explained in its decision memorandum the reason why a multiyear analysis and multiyear approach. What's that? What's the measurable impact? If the agency were determined that pinniped predation had dropped to a level that it did not have. Pardon? What level? A level which, based on the evidence, showed that the salmon runs, in terms of their abundance, were perhaps on the road to recovery, which is affected by many factors, including ocean productivity of the salmon, flow conditions. And other, you know, fisheries and other sources of predation, right? The dams. The agency does take into account in its consideration the other factors. And as the record demonstrates, has addressed and explained, indeed, why this is not an apples-to-apples comparison, because pinniped predation has a different relative biological impact, right? I think it's inaccurate, for example, to cite to these fisheries take. Well, I mean, I tend to agree with you on that. I mean, there are different ways for evaluating these different impacts on the salmon. But I think the question that I think both I and my colleagues are trying to get at is, well, so how do we determine, or how does one reviewing the decision determine what is a significant impact? I mean, it can't just be trust us, we're the agency, we know what we're doing. I mean, what is the standard that we apply? I mean, is it one salmon being eaten by one sea lion? Or what is the – I know you have this seven-factor test, but can you summarize how you decide whether the California sea lions are having a significant negative impact, if you don't use a quantitative standard? Yes, Your Honor. So you're hypothetical of one sea lion eating one salmon. The reason why that would be very unlikely to meet the standard is because of that single impact would not affect the viability of the salmon, would not affect their reproduction, their population numbers in terms of that general trend. And the reason why a qualitative approach is the appropriate one here, as the agency has determined, is because on the best available data, there's no reliable, quantifiable, bright-line threshold that we can set. I understand. And I asked counsel about that, too. You're really proposing sort of a holistic way of looking at it, because you have all these moving parts. But there has to be – there has to be a – I think counsel's argument is there has to be a point at which it's no longer a problem. And how do you know where that line is? I mean, how does – the agency will have its own opinion about it. It will make its own findings. How do you produce a reviewable record? What are the criteria that allow you to say this actually isn't a significant impact anymore? This would indeed be an inquiry that is based on the record that the agency presents. And I would offer as hypotheticals, for example, the two – two of the critical factors at issue here impacting salmon mortality is the fact that there's a depensatory effect, that sea lion predation is increasing as salmon run sizes decrease, that if that factor were to no longer be present, that could be a reason why the agency is increasing. Is there a trend that the salmon run is decreasing? The numbers are variable. And they're – in general, the predation rates are increasing. And the evidence shows that the sea lion predation is not necessarily tied to the size of the salmon run. And so the reason why that's a concern, Your Honor, is because unlike fish harvest, in which the agency has the authority and the ability to monitor and to stop harvest if necessary because salmon run numbers are low, in the case of sea lion predation, it's indiscriminate taking of the fish. So one of the changes in that component, I'm gleaning from the briefing and the decision, is when this case was before us before, California sea lions accounted for about 90 percent or more of the predation. Now it appears that the stellar sea lions, which are different – in a different category, are more dominant. So I'm assuming – or at least have increased. And I notice that your sixth factor, presumably, says that the two species have predation in combination. So let's go to my hypothetical. I asked the counsel for the Humane Society. Let's suppose it gets to the point over the next few years where stellar sea lions are accounting for 80 percent of the predation and California sea lions are 20 percent. So you can't euthanize the stellar sea lions. So the California sea lions, which would have, absent the presence of stellar sea lions, have minimal effect. They're kind of carrying the load for all of the predation, aren't they? And therefore, they're being targeted inappropriately? As a point of clarification, Your Honor, I think that the evidence, the data indicates that stellar sea lion predation may have increased, but it is still predominantly California sea lions. But with respect to Your Honor's hypothetical, I think in that circumstance, certainly the agency would take into account the proportion of take between the different sea lion species. And if it's such that the California sea lion lethal removal is contributing only an insignificant portion of the take, in that case the ‑‑ combined effect. So that's in favor of going after the California sea lions. You're saying they would take it into account. But why ‑‑ if it asserts that it has a combined effect, I don't understand why they would then differentiate. Well, because, Your Honor, another one of the important criteria that the agency is looking at is whether, upon review, the lethal removal program has any efficacy in terms of the goals of trying to address this problematic interaction. And if it were the case that California sea lions took one fish and stellar sea lions took, you know, a thousand, in that circumstance, controlling for California sea lions would likely not have any measurable effect on meeting that goal of addressing the interaction. In that case, the Section 120 authorization would likely, you know, taking into ‑‑ assuming all other factors being equal, in that circumstance, perhaps would not be justified to continue lethal removal against California sea lions because it would not be an effective program in that circumstance. Could you explain to me what's the justification for removing the 1 percent predation? Yes, Your Honor. So plaintiffs suggest that the Marine Mammal Commission, in fact, did refer to the idea that a qualitative number may be helpful. And the agency, indeed, responded to those concerns, considered them, and in consulting with the Northwest Region Science Center, determined that the modeling and the data available right now does not lend itself to a meaningful, conclusive way to measure. And so a qualitative approach better accounts for the variability inherent in, you know, everything that's at play here, as Judge Vogel mentioned, the various moving parts on the ground. Predation, for example, right now impacts a portion of listed stocks in the sense that it targets early and late arriving fish, and this has the effect of disproportionately targeting and putting at risk entire distinct population segments of fish. So there's a disparate impact in terms of the genetic stock, which goes into the impact on the survival and the recovery of these fish. I was – I saw that, and it leads to sort of a collateral issue we haven't talked about yet, which is that that looks like something that the agency came up with pretty late in the day, and there's a – one of the arguments being raised by the plaintiffs is it didn't comply with NEPA. What do you have to say about that? Well, Your Honor, the Ferguson Memorandum from 2011, it's not new and significant for purposes of supplemental NEPA review because, in part, the memorandum relies on studies from 1995 and 1997. I know the data is not new. I appreciate that. But the arguments and the way that the data is being applied is – I mean, I don't remember us talking about that when we were in Portland three years ago. I mean, this is a different reason, and it's in response to Judge Pius' question, really. It's why the agency decided not to keep the 1 percent threshold. So it seems to me it ought to have been dealt with somewhere in the procedural history so that people who disagreed with it could engage with it. And, Your Honor, indeed, the analysis and this sort of reasoning was actually present prior to this. In the 2010 task force report, this group, which is composed of marine biologists and other stakeholders in the community, looked at how the early part of the salmon run makes up a genetically important portion of the fish population and, therefore, should be protected, and that's on page 362 of the supplemental excerpts. So it was in the record in the earlier go-round or post-remand? This – so the two task force reports were from 2010 and 2011. However, in the 2008 environmental assessment, there was also discussion of, for example, the impact of salmon predation – or of sea lion predation at a constant increasing rate as salmon run sizes decreased. And so all of the – this analysis was contained in the prior environmental assessment. And, moreover, in proposing its Section 120 authorizations for these 2012 authorizations, the agency provided a period for public notice and comment and public input, and the public did have a chance to weigh in on all of these issues. Kennedy. Did they have a chance to look at the Ferguson memo and comment on that? I mean, it's pretty central to the decision memo. That's the principal source cited at least at page 453 or whatever the – 31 of the decision memo, but the – you know, 453 in the record. You know, the one cite that they give is on this depensation – or depensatory effect, which is a new argument. Is Ferguson – where did the – where did that come under any kind of examination? It's – the Ferguson memorandum is new, but the analysis contained in it is – it rephrases and I think it further explains the data and analysis that was in the existing environmental assessment. So it's just a slight clarification, or is the new – as Judge Fogel said, it strikes me as a new theory. Your Honor, it's not a new theory in the sense that the agency and the scientific reports that it relies on has consistently noted that there is a concern about the impact and the biological impact of predation that is at a constant rate when salmon runs decrease, and although the Ferguson memo, I think, applies, you know, this depensatory label to it, that term may be something that's used in the memorandum, but the analysis and the rationale exists before, and the – part of the reason, of course, for the agency's 2012 memorandum is to address this Court's concern about reconciling what were seemingly inconsistent studies. Your Honor, I said I would reserve five minutes. Thank you. Roberts. Good morning, and may it please the Court. Counsel, Cecil Renish Smith. I am with the Oregon Department of Justice, but I am appearing on behalf of all the State intervening agencies. I don't have much of substance to add to what the Federal defendants have been arguing, but I wanted to appear to answer any questions that you might have specific to the States and also just to offer the States' perspective. Sure. Could you, just as a factoid, if nothing else, counsel said that once these sea lions are targeted, if they're open season on them, if they're branded, and so if they're done in Astoria and aren't coming back to Bonneville anymore, is it true that they'll be euthanized? The way it works is that once a sea lion has been added to the authorization list for lethal resources. The hit list, the kill list. The kill list. Let's call it what it is. It is true that once the sea lion has been added there, it can be, if it is in Astoria, it may nevertheless be trapped and euthanized in Astoria. The one thing I might quibble with is that a sea lion that has reached that level at the dam where it has been listed is not likely to never go to the dam again. So if it is in Astoria, I think that the States are within reason to believe that it may nevertheless be going up the river at some point and continuing to do its predation at the dam. It would have been tagged if it hadn't been there in the first place. Correct. Correct. It had to have been observed eating salmon at the dam. And if in the — Yeah, but it was posited by counsel that the sea lion had learned its lesson and was never coming back. Well, sea lions are very, very intelligent, but we've also seen through the failure of our nonlethal deterrence efforts that they generally don't learn a lesson from the nonlethal deterrence actions. Those generally may put them off for a day, two days, or once they figure out that — What's the distance, just as a matter of, again, a factoid? How long — you know, how far is Astoria from Bonneville to say it's quite reasonable to think that it's — the fact that it's in Astoria does not signify anything other than it just happens not to have been found at Bonneville, but could just as easily have been found at Bonneville. Right. I am embarrassed to say that by river distance, I'm not sure I can tell you what it is by bicycle. If the sea lions were on a bicycle. But what I do know is that it generally takes one or two days for a sea lion to swim from Astoria to the dam. That was my question. Yeah. And then, in fact, if you look at the supplemental excerpt of record, pages 420 to 458, there is a state's field report from 2011 that includes a lot of pretty charts of GPS telemetry and radio telemetry showing sea lion progression from the coast, from Northern California to the dam, and individual sea lions. And it's actually pretty impressive how far these sea lions will come to get to the dam. I'm sorry. What's the bottom line? I mean, this is the question everybody's been talking about. But at what point do the states think there's not a problem anymore? Yeah. I'm happy you asked that question, Judge Vogel, because I was thinking about that while counsel was speaking. And it really does tie into the problem that the NIMFS found in trying to decide what's the quantitative number. And it's simply impossible from the models to say this number is the number at which it becomes insignificant. It really has to be a qualitative analysis based on what, when the predation is occurring, the populations upon which the predation is occurring, and what contribution the sea lions at the dams are having to the mortality on that population. Are you confident that the seven factors would give a reviewing body enough to work with so that they could decide whether it was arbitrary and capricious or not? Yes. Yes, I am. And part of the... So what do we look at five years down the road when... Five years down the road? ...the predation, there's another authorization for another five-year period, and there's another lawsuit? Correct. I see my light is on. I'd like to answer that question. No, go ahead. Yeah. What we look at in five years is what's going on? What's going on at the dam? When are the runs coming in? When were the sea lions there? When were the sea lions eating the salmon? Are they still doing it at the start and end of the runs where we have the most vulnerable, discreet populations that the court was talking about? And I understand that the court had concerns about the Ferguson report and the concept of the depensatory effect, but the fact that one of the concerns everyone had was about when the sea lion were there and which populations they were eating, that's always been an issue. That's always been before the court and before the agency in terms of when the sea lion are there. You know, if it's just, you know, in the middle of big runs and that's the only time they come, then, you know, that's one of the factors that is in that list of factors. That's one of the things that the states and the government would be looking at. Would be. What if the trend over the five years started and became very clearly statistically pointing toward a steady year-by-year decline? Is there anything in the process to say, okay, we don't need to wait five years, we don't need to keep targeting the sea lions, at least the California sea lions, because the problem is going away? If every year we had a decline in the sea lion predation, a decline in the mortality at the dam, a decline in mortality on these discrete vulnerable populations at the start and tail end of the runs, and if every year we were getting greater and greater runs and fewer and fewer sea lions, you know, yes, there would come a point where it would be like, okay, we've got greater and greater runs, fewer and fewer sea lions, the sea lions simply aren't eating these salmon. There will come a point when looking at all the factors that are in the decision  making, you know, you're going to have to wait five years. Is there anything that could be done at year three rather than waiting out five years? There's a mechanism? In the current process, I don't believe there is. In the current process, it's five years. So it's five years even if there's a steady observable, and then actually nobody would think it's significant after year three, but it just took five years to go around and figure that out? Well, I think that the problem is that if you look over the history of how the runs have gone and how the predation has gone, even a three-year time span may be too short to figure that out, to figure out that there's a steady decrease. I understand it may be. My question is, is there a process or a mechanism, if it turns out? Because I noticed 2011 did drop. If you look back over the prior years, it was up and down. But let's say 2011 replicates in 2012 and 2013, and it's always a steady downward increase. And you're saying that you just go ahead and run out the five years just to be sure? I must admit that I do not know whether the current letter of authorizations, as stated, allow for the fisheries to yank the authorization at three years, or whether they have to wait to the five year. I just don't know. And what I would say is that, you know, the states are fully cognizant of all the issues involved and the concerns on both sides. And, you know, if predation got to the point in three years where we didn't have predation and we could confidently say it's never going to be a problem again, then I don't think it would be likely that the states would then willy-nilly still go ahead and kill sea lions. And if I could make just one more point, I know I'm well over your time. Make this point, and then that's it. The only point I would like to make is that there's been a theme throughout this that all the states want to do is kill sea lions. And that's simply not true. The states have numerous obligations in terms of the salmon population and the demands on the state and on the population and on the control, and they really are doing everything they can. And this is just one source of mortality that they haven't been able to control and they would like to be able to. Thank you, counsel. I find it amazing that the states and the Federal Government found a way to authorize under some qualitative standard that they claim they have the killing of otherwise federally protected sea lions. But nowhere in counsel's arguments today, neither the federal counsel or the state counsel, could they identify any point at which that should end. In fact, Judge Fogel asked federal counsel, how do we tell what's significant to salmon? Counsel mentioned jeopardy. That's the Marine Mammal Commission's suggestion. It's not in the decision. It's not what the agency used. I'll answer that last question about the five-year authorization. There is nothing in the decision that allows it to end apart from the five-year termination point. That's it. So with respect to Judge Fischer's hypothetical, if predation drops a year three to basically nothing, there's nothing that stops the authorization by the federal government, which is what's at issue here. And federal counsel called our claim that predation is dropping and may drop to tiny levels, if nothing at all, hypothetical, and says that we don't point to any evidence. Well, our evidence is in the excerpts of record at page 428. It's the charts that are in the decision memo. And they show that predation has been dropping every year since the States first asked for kill authorization, from 4.2 percent to 2.8 percent to 2.1 percent to 1.8 percent to 1.1 percent and on. Roberts. I ask you a question that actually relates to what you're talking about. Judge Fischer asked you earlier about the remedy. Yeah. Does this Court have any ability to constrain or limit the parade of horribles you've been talking about without vacating the decision? I don't think so, because I think that this decision obviously has been vacated before, and I think the problems are so fundamental to the decision in terms of not really grappled with what is insignificant, we may be there already. And let me make that point. There's actually no evidence for the agency's position that it takes, particularly in response to why it doesn't have to do NEPA, that the 1-year average, the 1-year running average, there's also a justification for eliminating the 1 percent termination clause, that the 1 percent termination provision that was in the prior authorization would be unlikely to be met, because those numbers that I started mentioning, seriatim before, we're down to 1.1 percent now. Right. And one of those. I'm sorry. I was just asking. It's really more of an administrative law question. Assuming that you've convinced us, and I don't know if, you know, I'm just saying, assuming you've convinced us that there's a little bit too much wiggle room in these qualitative criteria, can the court of appeals, through its decision on review, take away some of that wiggle room, or do you have to go back to square one and start the administrative process over? I think you probably have to start the administrative. I'd like to say not. I'd like to say the court of appeals could indicate that, given the facts on the ground here in our review in the past, that this situation, you know, needs to be remanded, needs to be vacated, and there needs to be particular considerations of certain facts. But I think in this circumstance, unfortunately, it would have to go back entirely, because, again, the problem is fundamental as respect with everything. There's no standard for where it should end. The definition of significant means any impact. You got it. You answered my question. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. Have a safe trip back to Washington, D.C., and back to Oregon, and wherever everybody's from. Safe travels. Thank you. The matter is submitted now.
judges: Fogel, Fisher, Paez